FILED
John E. Triplett, Clerk of Court
United States District Court
By jburrell at 2:48 pm, May 13, 2022

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | INFORMATION NO. 4:22cr-65 |
| ) | |
| v. ) | 18 U.S.C. § 371 |
| ) | Conspiracy to Commit an Offense |
| DARA BUCK ) | Against the United States |
| A.K.A. DARA BUTLER ) | |

**THE UNITED STATES ATTORNEY CHARGES THAT:**

Introduction

At all times material to this Information:

1. Beginning no later than August 2017 and continuing through at least May 2021, **DARA BUCK**, together with known and unknown co-conspirators, in the Southern District of Georgia and elsewhere, conspired to engage in multiple schemes to defraud the United States government.

2. **BUCK**, an active duty solider in the Army (Chief Warrant Officer 2) stationed at Fort Stewart, Georgia, at the time of these events, lead a prolific fraud scheme. **BUCK** and her co-conspirators submitted more than 150 fraudulent Payroll Protection Program loan applications for COVID-19 relief funds. She and her co-conspirators also submitted more than a dozen fraudulent student loan discharge applications to the United States Department of Education. These schemes ultimately caused millions of dollars in losses to the United States.

Background

**A. The Small Business Administration**

3. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or about March 2020 designed to provide emergency financial assistance to the millions who are suffering the economic effects caused by the COVID-19 pandemic.

4. Among other relief efforts, the United States sought to provide financial support to eligible businesses that could be used to offset certain business expenses.

5. The Small Business Administration ("SBA") is an executive branch agency of the United States government that provides support to entrepreneurs and small businesses. The SBA is headquartered in Washington, DC and maintains its computer servers outside of the State of Georgia. The SBA's mission is to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

6. As part of this effort, the SBA enables and provides for loans through banks, credit unions, and other lenders. These loans have government-backed guarantees. In addition, the SBA provides loans that come directly from the U.S. Government.

7. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection

Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

8. To obtain a PPP loan, a qualifying business had to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) had to state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures were then used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, a business applying for a PPP loan had to provide documentation showing its payroll expenses.

9. A PPP loan application must be processed by a participating lender, such as a financial institution. If a PPP loan is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by the SBA. Data from the application, including the information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

10. The PPP loan proceeds must be used by the business on certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal of the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period

of time and uses a certain percentage of the PPP loan proceeds on payroll expenses.

### B. The Department of Education

11. Pursuant to Title IV of the Higher Education Act of 1965 ("Title IV"), as amended, the Department of Education (the "Department") oversees federal financial aid programs that provide financial assistance to qualifying applicants.

12. Under Title IV, student loan borrowers with a total and permanent disability ("TPD") qualify to have the following loans discharged: William D. Ford Direct Loan Program, Federal Family Education Loan Program, Federal Perkins Loan Program, and Federal Perkins Loan Program (collectively, "Federal Student Loans").

13. To qualify for a TPD based discharge, an applicant had to electronically submit an application to Nelnet, third-party contractor and servicer acting on behalf of the Department. A TPD discharge applicant could make a TPD showing by providing Nelnet with supporting documentation from three sources during the timeframe of the conspiracy: (1) the U.S. Department of Veterans Affairs (VA); (2) the Social Security Administration; or (3) a physician's certification.

14. With respect to the VA, an applicant was eligible for a TPD Federal Student Loan discharge if the veteran had received a determination that the veteran had a service-connected disability that is 100% disabling and/or the veteran had a determination that the veteran was totally disabled based on an individual unemployability rating.

## COUNT ONE
*Conspiracy to Commit an Offense Against the United States*
18 U.S.C. § 371

15. Beginning no later than August 2017 and continuing through at least May 2021, in Liberty County, within the Southern District of Georgia, and elsewhere, the defendant, **DARA BUCK**, aided and abetted by others, did knowingly and willfully combine, conspire, confederate, and agree with at least one other person to commit the following offenses against the United States, that is:

   a. wire fraud, that is to devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing the schemes and artifice and to obtain money and property, caused to be transmitted wires and signals in interstate and foreign commerce, namely interstate communications to be made over the internet, in furtherance of the scheme and artifice to defraud, in violation of 18 U.S.C. § 1343; and

   b. to devise a scheme and artifice to defraud the Department, specifically its student aid programs, of money by means of false and fraudulent promises, representations, and pretenses, in violation of 20 U.S.C. § 1097(a).

### The PPP Scheme

16. One object of the conspiracy was for **BUCK** and her co-conspirators to unjustly enrich themselves by making fraudulent PPP applications to the SBA and to financial institutions, to unlawfully induce the SBA and PPP lenders to dispense

money and funds to coconspirators to which they were not entitled, and who, in turn, would pay a fee to **BUCK**.

17.   In furtherance of this scheme, and to effect the objects thereof, the following acts were committed in furtherance of the conspiracy:

   a. It was part of the conspiracy that **BUCK** filed fraudulent online PPP loan applications to lenders located outside of the State of Georgia on behalf of several businesses that she purportedly owned. For each of these businesses, **BUCK** falsely represented that the respective business had approximately $100,000 in 2019 gross income and a monthly payroll of approximately $8,333.30. Defendant did so in order to receive PPP loans of approximately $20,833.00 each, which represents the maximum PPP loan available for a business that employs a single employee. **BUCK** secured more than $100,000 in fraudulent loans on behalf of her purported businesses.

   b. It was also part of the conspiracy that **BUCK**, and other co-conspirators, known and unknown, filled out fraudulent PPP loan applications for other individuals and businesses in exchange for a fee. **BUCK** and her co-conspirators utilized cellular devices, email, and the internet to create these fraudulent PPP applications. Co-conspirators would send personal identifying information and banking information to **BUCK**. **BUCK**, in turn, would use the Internet to submit PPP loan applications to lenders located outside of the State of Georgia using this information.

c. Similar to **BUCK's** personal fraudulent PPP applications, the fraudulent PPP applications she and her co-conspirators did for third parties also falsely claimed the applicant had a 2019 gross income of approximately $100,000 and a monthly payroll of approximately $8,333.00—with the goal of securing each client a $20,833.00 PPP loan. Also similar to **BUCK's** personal applications, **BUCK** created fictitious tax documents that included ginned up financial numbers for the applicants and supplied them to PPP lenders in support of the loan request.

d. In reliance on false representations made in PPP applications created by **BUCK** in conjunction with her co-conspirators, banks headquartered outside the State of Georgia, by means of wire communication, deposited millions of dollars into co-conspirators' bank accounts resulting from this scheme.

e. In exchange for **BUCK** completing a fraudulent PPP application, **BUCK's** co-conspirators paid **BUCK** a fee ranging from $500 to $1000 per PPP application. Co-conspirators transmitted this to **BUCK** via CashApp, Zelle, or by cash transactions.

18. Between in or around December 2020 through in or around May 2021, **BUCK**, in the Southern District of Georgia and elsewhere, caused to be submitted more than 150 fraudulent PPP applications on behalf of herself and co-conspirators, which resulted in more than $3,500,000 being disbursed from banks to members of the conspiracy.

### Overt Act in Execution of PPP Scheme

19. On or about February 9, 2021, in the Southern District of Georgia, and elsewhere, **DARA BUCK**, aided and abetted by others, for the purpose of executing the scheme and artifice described above, and attempting to do so, caused to be transmitted in interstate commerce, by means of a wire communication, certain signs, signals, and sounds: that is, **BUCK** and Co-conspirator 1 caused to be transmitted a fraudulent electronic PPP application and supporting fictious Schedule C tax document from the Southern District of Georgia to Bank 1 in Utah, which caused Bank 1 to deposit $20,834 into Co-conspirator 1's account at Bank 2, and in exchange, Co-conspirator 1 paid **BUCK** $500, in violation of Title 18, United States Code, Section 1343.

### The Federal Student Loan Discharge Scheme

20. Another object of the scheme was for **BUCK** and her Co-conspirators to unjustly enrich themselves by submitting fraudulent discharge applications and supporting documents in an effort to wrongfully discharge Federal Student Loans under false pretenses.

21. In furtherance of this scheme, and to effect the objects thereof, the following acts relating to TPD applications to fraudulently discharge Federal Student Loans were committed in furtherance of the conspiracy:

    a. **BUCK** and co-conspirators, known and unknown, submitted fraudulent TPD applications to discharge Federal Student Loans on behalf of **BUCK** and others. For each, **BUCK** submitted TPD discharge applications that falsely

claimed the applicant was a qualifying disabled veteran. To support the application, **BUCK** created fictitious letters that purported to come from the VA that claimed the applicant had a 100% disability rating.

b.  In reliance on these false representations, the Department would discharge the applicant's Federal Student Loans.

c.  **BUCK's** co-conspirators paid her a fee of approximately $350 to $500 for each fraudulent TPD application she submitted.

22.  Between in or around August 2017 through in or around March 2021, **BUCK**, while in the Southern District of Georgia, caused to be submitted more than a dozen fraudulent TPD applications on behalf of herself and co-conspirators, in an effort to discharge more than $1,000,000 in Federal Student Loans.

### Overt Act in Execution of Federal Student Loan Discharge Scheme

23.  On or about November 18, 2018, **DARA BUCK** submitted, or caused to be submitted, an application seeking to discharge Co-conspirator 2's Federal Student Loans on the basis that he was unemployable due to a service-connected disability. In support of Co-conspirator 2's application, **BUCK** submitted a fictitious letter that purported to come from the VA claiming that Co-Conspirator 2 had a 100% service-connected disability. Co-conspirator 2 is not a veteran and is not disabled. In reliance on **BUCK** false representations, Co-conspirator 2 had approximately $17,108 in federal student loans discharged in violation of 20 U.S.C. § 1097(a).

All done in violation of Title 18, United States Code, Section 371.

_____
Patricia G. Rhodes
Assistant United States Attorney
Chief, Criminal Division

_____
Patrick J. Schwedler
Assistant United States Attorney
*Co-lead Counsel

_____
Jonathan A. Porter
Assistant United States Attorney
*Co-lead Counsel